## <u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS</u>

I, Matthew Cromly, a Special Agent (SA) of the Federal Bureau of Investigation (FBI), hereinafter referred to as Affiant, being duly sworn under oath states as follows:

### <u>INTRODUCTION</u>

1. Affiant is an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, in that Affiant is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code (U.S.C.).

2. Affiant has been employed as a Special Agent with the FBI since November 2002. From July 2007 to the present, Affiant has been assigned to the Cleveland Field Office, Toledo Resident Agency, where Affiant has worked foreign counterintelligence, domestic and international terrorism, as well as organized crime investigations. Since 2017, Affiant has been fully assigned to investigations involving violations of federal public corruption statutes.

3. Affiant has participated in investigations and prosecutions involving money laundering offenses, crimes of violence, firearms violations, interstate transportation of stolen property, organized criminal activities and various other frauds. Additionally, Affiant has made numerous arrests and executed search warrants for the above outlined offenses.

4. As a Special Agent of the FBI, Affiant has received basic criminal training at the FBI Academy located in Quantico, Virginia, as well as numerous on-the-job trainings such as those relative to working undercover investigations and handling FBI Confidential Human Sources (CHSs). As a federal law enforcement officer of over 17 years, Affiant has participated in and/or prepared hundreds of federal search and arrest warrants, and has been the Affiant in and has executed search warrants resulting in the seizure of business and financial accounts as

evidence of criminal activity. Affiant has supervised the activities of informants who have provided information and assistance resulting in the federal prosecution of felony offenders. Additionally, Affiant has training and experience with investigations that included wire and electronic interceptions. Specifically, Affiant was a lead investigator of an international criminal organization where wire and electronic communications were intercepted for about nine (9) consecutive months over five (5) different telephone lines. Affiant authored some of the affidavits for those interceptions.

5.      Based upon Affiant's experience, Affiant is familiar with the *modus operandi* of persons involved in activities in violation of federal public corruption statutes to include bribery, *quid pro quo* arrangements, kickbacks, and illicit money laundering, as well as the terminology used by persons involved in such activities and crimes. Affiant is aware that persons involved in these crimes routinely attempt to layer themselves from the overt crimes taking place. Those involved in public corruption violations who routinely engage in bribery are also known to have businesses, properties, utilities and other items purchased in the names of others in order to conceal the association of criminal activities with financial transactions. Affiant is aware that persons involved in bribery arrangements maintain telephonic contact with persons from whom they receive cash in exchange for their official actions, such as votes on city council.

## STATUTORY VIOLATIONS

6.  Title 18, United States Code, Section 666(a)(1)(B) prohibits "an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof [from]. . . corruptly solicit[ing] or demand[ing] for the benefit of any person, or accept[ing] or agree[ing] to accept, anything of value from any person, intending to be influenced or

rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." The organization, state or local government, state or local agency, or tribal government must have received federal assistance in excess of $10,000 in a one-year period.

7.      Title 18, United States Code, Section 875(d) prohibits a person "with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime."

8.      Title 18, United States Code, Section 1951 prohibits a person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do. . . ." Extortion "means obtaining of property from another, with his consent, . . .under color of official right."

## BACKGROUND INFORMATION

9.      Toledo, Ohio City Council (City Council) is the legislative branch of city government.  Toledo receives more than $10,000 in federal financial assistance every year. Legislative authority in the city is vested in a twelve-member City Council.  Six members of City Council are elected at-large and six from districts.  Each member serves four-year terms. There are four current council members that are the subjects of this affidavit: Tyrone Riley[1]

---

[1] Riley is a licensed Ohio attorney; however, he has indicated he does not have an active law practice.

(District 1); Yvonne Harper (District 4); Garrick "Gary" Johnson (At-Large)[2]; and Larry Sykes (At-Large).

10.     City Council is authorized to enact ordinances and resolutions relating to city services, tax levies, appropriating and borrowing money, licensing and regulating businesses and trades and other municipal activities. Often, City Council considers and votes on zoning changes and "special use permits" (SUPs) for local businesses.  These requests are evaluated by various departments/committees before approval and are typically discussed and considered at three public hearings: the City Plan Commission meeting, the Zoning and Planning Committee meeting, and they are ultimately voted on to be approved or rejected at a full City Council meeting.  The City Plan Commission meeting consists of a panel of appointed citizens.  After an SUP is evaluated at the City Plan Commission meeting, that body then forwards their evaluation to the Zoning and Planning Committee.  At the Zoning and Planning Committee meeting, which consists of members of City Council, the SUP request is further evaluated at a public hearing, whereupon a recommendation is forwarded on to the full City Council with a recommendation of either approval, disapproval, or with no recommendation.  Ultimately, the SUP must pass City Council to be approved.  If the SUP is forwarded with a recommendation for approval, a simple majority is sufficient; however, if the SUP is recommended for disapproval, there must be a super majority of nine to approve the measure.

11.     In early 2018, the FBI began to investigate Toledo City Council members for soliciting and/or accepting cash, checks, money orders, or other things of value from local

---

[2] Additionally, Johnson sought the democratic nomination for Lucas County Sheriff. Johnson lost the primary election on April 28, 2020.  The general election is on November 3, 2020.

business owners in exchange for their votes on City Council. The FBI utilized numerous Confidential Human Sources (CHSs); recorded telephone calls, text messages, in-person meetings; and analyzed numerous financial, business, and government records. The investigation revealed that City Council members Tyrone Riley, Yvonne Harper, Larry Sykes, and Gary Johnson all accepted bribe payments for official acts. Additionally, it was determined that Harper used a local attorney, Keith Mitchell, to solicit and funnel her bribe payments. Each councilperson used cellular telephones to make calls and send text messages to arrange these transactions. All in-person meetings and calls discussed below were recorded by FBI devices or technology unless otherwise noted.

12.     City Council maintains offices at One Government Center, 640 Jackson Street, Toledo, Ohio. Each councilperson has an office at One Government Center on the 21st floor that is furnished with a computer used for official council duties and is given a city email address with a variation of their name "@toledo.oh.gov." The City Council clerk emails all councilpersons weekly with the upcoming agenda for City Council meetings, including those projects or issues that are subject of this affidavit. Mitchell operates a law office at 338 N. Erie Street, Toledo, Ohio and uses a Hotmail email address. All subjects used their cell phones to communicate and conduct the illegal bribery activities. Such calls and text messages, including those made to people within Ohio, must travel to the service provider's server outside the state.

13.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, officers, and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and warrants and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

14.     On March 5, 2018, federal law enforcement interviewed an individual referred to throughout this affidavit as SOURCE 1[3].  SOURCE 1 owns numerous commercial properties, primarily gas stations and convenience stores, within the city limits of Toledo.  SOURCE 1 reported that he/she previously provided Riley things of value for his vote on pending matters before Council.  For example, SOURCE 1 reported that in 2013 he/she purchased a gas station and convenience store on Dorr Street, and SOURCE 1 had a liquor license for that location. Shortly thereafter, another business wanted to open a gas station and convenience store nearby. That businessman needed City Council to approve his SUP in order to open the business. SOURCE 1 reported that he/she went to Riley's office in One Government Center to discuss his/her concern and wanted Riley to vote against the pending SUP.  After listening to SOURCE 1's concern, Riley advised SOURCE 1 that he was having a fundraiser that day and requested money.  SOURCE 1 wrote Riley a $300 check and gave it to him.  Additionally, Riley asked SOURCE 1 if alcohol could be delivered to SOURCE 1's business for Riley's upcoming fundraiser.  SOURCE 1 opined Riley did so in order to avoid paying the requisite taxes on the alcohol by having the alcohol delivered to a liquor license holder.  SOURCE 1 agreed to accept

---

[3] SOURCE 1 has criminal conviction for credit card fraud in California dating back to the mid-1990s.  He/she has no known criminal history within the previous 20 years.  SOURCE 1 was arrested on February 15, 2018 for being in the U.S. illegally.  It is believed that SOURCE 1 entered into a marriage on or about December 2, 2000 with a U.S. citizen with the sole intent of obtaining immigration benefits.  SOURCE 1 then applied for Lawful Permanent Resident status based upon that fraudulent marriage, which was denied.  Subsequent to this denial, SOURCE 1 has remained in the U.S. without lawful immigration status.  Such conduct, if proven, would subject SOURCE 1 to possible criminal and immigration consequences.  No federal law enforcement officer, including the FBI and the Department of Homeland Security, made any promises to him/her about the ultimate disposition of the marriage fraud allegation, nor has the federal government paid SOURCE 1 any financial benefit.  SOURCE 1 hopes for leniency in both criminal and immigration matters.

the delivery of alcohol.   When the shipment arrived, Riley requested that SOURCE 1 pay the delivery fee, which was approximately $300.  SOURCE 1 agreed, but requested Riley not to cash the check he/she wrote him at his office.  Despite this request, Riley not only cashed the check, but he also did not reimburse SOURCE 1 for the delivery fee, thus taking about $600 from SOURCE 1.  SOURCE 1 provided this money in exchange for Riley's anticipated support and official acts on behalf of SOURCE 1's businesses.  After providing this historical information, SOURCE 1 agreed to cooperate with the investigation.

15.     The FBI reviewed Riley's bank accounts, specifically his "Riley for City Council" account. On June 13, 2013, Riley deposited a check for $300 into this account from SOURCE 1's spouse referencing, "Fundraiser" on the memo line.

### A. SOURCE 1's "Curb Cut"

16.     Under the direction of the FBI, in May 2018, SOURCE 1 filed paperwork with the City of Toledo requesting a "curb cut" be placed near his/her gas station/convenience store off of Dorr Street in order to increase traffic flow into his/her business.   This business was in Riley's district.  Such a request required an SUP that needed approval from City Council.

17.     Prior to the City Council vote, SOURCE 1 arranged a lunch meeting with Riley to discuss this project and ask for his support. On May 23, 2018, SOURCE 1, Riley, and a middleman (MIDDLEMAN 1) met at a restaurant in Toledo.  SOURCE 1 and MIDDLEMAN 1 had a pre-existing relationship, and SOURCE 1 knew MIDDLEMAN 1 was trusted by Riley. During the meeting, SOURCE 1 discussed the "curb cut" with Riley, and Riley expressed his support for the project. After the meal, Riley never attempted to pay for his portion of the approximately $130 bill.  Riley then ordered a meal (prime rib and carrot cake) "to go" knowing SOURCE 1 would pay for it.  In the parking lot, Riley and MIDDLEMAN 1 talked briefly

outside of the presence of SOURCE 1. MIDDLEMAN 1 immediately thereafter approached SOURCE 1 and told him/her that Riley wanted $2,000 to be delivered to a family member soon. SOURCE 1 believed this money was dependent on whether Riley would vote to support the desired SUP, and SOURCE 1 asked MIDDLEMAN 1 to advise when and where to make the payment.

18.     On May 31, 2018, SOURCE 1 had a second lunch meeting with Riley and MIDDLEMAN 1 at a different restaurant in Toledo. During the meeting, SOURCE 1 discussed the "curb cut" again with Riley. SOURCE 1 then slid $2,000 cash in an envelope across the table to Riley. SOURCE 1 informed Riley that there was $2,000 in the envelope and tapped the envelope saying, "this is for your support," referring to the SUP. MIDDLEMAN 1 then added $1,000 of his/her own money[4], whereupon Riley indicated for MIDDLEMAN 1 to take the $3,000 cash in lieu of Riley accepting it in a public setting. As directed, MIDDLEMAN 1 took the envelope. MIDDELMAN 1 later purchased four (4) $500 money orders with the money, forging SOURCE 1's name as the purchaser of the money orders. The money orders were payable to Riley.

19.     The FBI reviewed two of Riley's bank accounts: "Riley for Council" and "Smith Park Community Coalition." Over several months, Riley deposited three of the four $500 money orders purchased by MIDDLEMAN 1 with SOURCE 1's money in his "Riley for Council" account. Riley deposited the other $500 money order in his "Smith Park Community Coalition" account.

---

[4] This $1,000 bribe payment is discussed more fully in paragraph 28.

20.    On June 20, 2018, MIDDLEMAN 1 met SOURCE 1.  MIDDLEMAN 1 said Riley was upset with SOURCE 1 for being too obvious when giving him the money (bribe payment) in the restaurant.  MIDDLEMAN 1 directed SOURCE 1 to be more discrete in the future.  Nonetheless, MIDDLEMAN 1 indicated Riley ultimately will support his/her SUP, and vote in the affirmative.

21.    On December 10, 2018, the FBI approached MIDDLEMAN 1.  MIDDLEMAN 1 admitted to paying bribes to Riley and acting as a conduit for SOURCE 1 to pay bribes to Riley. For example, MIDDLEMAN 1 admitted he/she took SOURCE 1's $2,000 bribe payment on May 31, 2018 and divided it into four equal $500 money orders, at Riley's request, and forged SOURCE 1's name on the money orders.  MIDDLEMAN 1 agreed to cooperate with the investigation, and will hereinafter be referred to as SOURCE 2[5].

22.    On December 11, 2018, SOURCE 2 spoke with Riley about SOURCE 1's "curb cut."  SOURCE 2 confirmed SOURCE 1's previous $2,000 bribe payment to Riley and indicated SOURCE 1 was willing to pay more money if necessary.  Riley agreed to meet again over lunch.

23.    On January 2, 2019, SOURCE 1 met with Riley at a restaurant in Toledo.  They discussed the $2,000 bribe payment from May 31, 2018.  Riley reassured SOURCE 1 that he would take care of everything necessary to get the SUP approved.  They also discussed other business plans.  Riley asked SOURCE 1 to financially support Riley's re-election event and left without paying for his meal.  SOURCE 1 paid for Riley's meal.

---

[5] SOURCE 2 does not have any criminal history; however, his/her actions before cooperating could subject him/her to criminal penalties.  Additionally, his/her internet café businesses may be in violation of federal and/or state gaming laws.  No federal, state, or local law enforcement officer made any promises to him/her about the ultimate disposition of his/her actions.  SOURCE 2 hopes for leniency.

24.     On February 28, 2019, SOURCE 1 attended a neighborhood meeting ran by Riley.  Riley addressed the "curb cut" for SOURCE 1 and advocated for it.  There were no objections raised by the attendees.  As SOURCE 1 was leaving, Riley told him/her that they would be in contact soon.

25.     On March 14, 2019, SOURCE 1's SUP regarding the "curb cut" passed the Plan Commission with a recommendation for approval.  This SUP was scheduled for a full vote with City Council in April 2019.  That same day, SOURCE 1 called Riley.  SOURCE 1 asked for reassurance about having the requisite number of votes to have the SUP pass on City Council.  Riley assured SOURCE 1 he would take care of everything.

26.     On April 30, 2019, the day of the Council vote, while walking into City Council chambers, Riley again assured SOURCE 1 he garnered the votes, but told SOURCE 1 that he would abstain[6].  At the meeting, Council approved the SUP allowing SOURCE 1 to put a "curb cut" at his/her business on Dorr Street.  As a condition for approving the SUP, SOURCE 1 was required to install a sprinkler system on the property.  As he indicated to SOURCE 1 that he would, Riley abstained from the vote.  All other members of City Council voted in the affirmative.

27.     On May 9, 2019, SOURCE 1 had lunch with Riley.  SOURCE 1 thanked Riley for his assistance with the vote, and Riley answered, "You're welcome."  SOURCE 1 stated, "This cut is a very big deal to me, whatever you want, I'll do it, if you want me to give it to [SOURCE 2], I'll give it to (him/her), you know, however you want it."  RILEY answered, "OK. Thank you for your support!"  The two also discussed why Riley abstained from the April 30,

---

[6] Given this was not a planned Source meeting, SOURCE 1 did not consensually record this brief exchange with Riley.

2019 vote. Riley explained that since they were doing business together, it is better to abstain so there is no appearance of impropriety. Riley then solicited more money from SOURCE 1. Riley stated he needed $500 from SOURCE 1 to offset the costs of an event he recently held. Riley told SOURCE 1 he would contact him/her soon to obtain the money. Riley left the restaurant without paying for his meal and ordered carrot cake "to go."

**B. SOURCE 2's Holland-Sylvania Road Internet Café**

28.     In approximately April 2018, prior to SOURCE 2's cooperation, and on his own volition, SOURCE 2 applied for re-zoning of an internet café[7] business on Holland-Sylvania Rd., Toledo, Ohio. During the May 31, 2018, meeting discussed in paragraph 18, SOURCE 2 gave Riley $1,000 for his eventual vote on this project. This $1,000 was in addition to SOURCE 1's $2,000 bribe payment made that day.

29.     On October 23, 2018, City Council voted on this project. Just prior to the vote, Affiant personally observed Riley give SOURCE 2 a "thumbs up" in City Council chambers. Moments later, Riley and the rest of City Council voted in favor of SOURCE 2's SUP for his/her internet café on Holland-Sylvania Rd.

30.     On October 24, 2018, SOURCE 2 sent a text message to Riley to thank him for the vote. The two conferred regarding an additional payment to Riley in the amount of $1,000. The money was to come from two separate businesses of SOURCE 2. Riley directed SOURCE 2 to write the checks payable to "Smith Park Community Coalition."

---

[7] Internet cafés as proposed in the affidavit are internet-based casinos where customers can play games of chance on computers. Although internet based, the customers get cash payouts at most of these physical locations. According to the Ohio Casino Commission, it is illegal for a business to payout anything of value more than $10 from a game of chance.

31.     On October 26, 2018, Riley called SOURCE 2 to coordinate picking up the checks.  SOURCE 2 directed Riley to pick up one $500 check from his business and to meet with him/her personally to get the other $500 check at a second business location.

32.     The FBI reviewed two of Riley's bank accounts: "Riley for Council" and "Smith Park Community Coalition."  On October 29, 2018, Riley deposited two checks, each for $500 (total of $1,000), from SOURCE 2's business accounts into Riley's "Smith Park Community Coalition" bank account.

33.     After SOURCE 2 agreed to cooperate during December 2018, he/she confirmed that he/she gave Riley a total of $2,000 in return for Riley's vote on the Holland-Sylvania internet café re-zoning issue.

### C. SOURCE 2's Central Avenue Internet Café

34.     In approximately October 2018, SOURCE 2 applied for an SUP to open an internet café on Central Avenue in Toledo, Ohio.  The address of the proposed location was within Harper's district.  At the time, SOURCE 2 did not have the same type of relationship with Harper as he/she enjoyed with Riley.  As such, SOURCE 2 reached out to an acquaintance referred to in this affidavit as "M.F."  M.F. is a fellow business owner in the Toledo area. During April 2016, in the face of strong opposition[8], City Council recommended approval for renewal of a liquor license for one of M.F.'s businesses within Harper's district.  SOURCE 2 asked M.F. how he secured Harper's favorable recommendation to retain his liquor license at

---

[8] A neighboring business owner had several problems with M.F.'s business, primarily M.F.'s customers would buy liquor at M.F.'s store and loiter on the business owner's property.  These customers would become heavily intoxicated and urinate and defecate around the property.  This activity greatly reduced customer traffic, thus the neighboring business strongly advocated with City Council for M.F.'s liquor license to be revoked.

that location against such strong opposition from neighboring businesses and the Toledo Police Department.  At that time and before SOURCE 2 was an FBI CHS, M.F. explained that he paid Harper a $4,000 or $5,000 bribe through a local attorney, Keith Mitchell, which was the only way to ensure her support.  M.F. suggested SOURCE 2 do the same in order to get his/her SUP approved.  SOURCE 2 eventually bribed four (4) City Council members for this SUP: Harper (through Mitchell), Johnson, Riley, and Sykes.  On February 25, 2020, the Central Avenue internet café SUP passed City Council unanimously.  Each councilperson is discussed in turn below.

### a.  Bribe Payments to Harper

35.    On December 12, 2018, SOURCE 2 called M.F.  M.F. rehashed his past bribe payment to Harper.  SOURCE 2 said he/she wanted assistance with his/her bribe payment to Harper.  M.F. said he did not want to talk about this issue over the telephone and that SOURCE 2 should visit him in person.  Later that day, SOURCE 2 met with M.F., and M.F. told SOURCE 2 he/she must go through Mitchell to get the bribe payment to Harper.  M.F. agreed to set up a meeting with Harper for SOURCE 2.

36.    On December 14, 2018, SOURCE 2 called M.F.  M.F. said he arranged a meeting with Harper for SOURCE 2 during which SOURCE 2 should tell Harper he/she wants to make a "donation" to the city.

37.    On December 17, 2018, SOURCE 2 called M.F.  M.F. told SOURCE 2 that he/she should not call Harper directly about the bribe money and that the money must go through Mitchell.  M.F. explained that Mitchell previously warned him not to pay cash directly to Harper and that they must go through him.

38.     On December 19, 2018, SOURCE 2 called M.F. to arrange a final meeting time with Harper.  M.F. instructed SOURCE 2 to come to his store because he did not want to talk on the telephone.  SOURCE 2 and M.F. met in person.  M.F. reiterated that they must go through Mitchell to make the payment.  M.F. explained that Harper told him from the start that the money must flow through Mitchell and not directly to her.  M.F. believed Harper was in need of money because she was up for re-election that year.

39.     On January 3, 2019, SOURCE 2, M.F., and Harper met at her office in One Government Center.  SOURCE 2 and M.F. told Harper they wanted to "take care" of her in return for her support of their business initiatives.  Harper responded that she was feeling "generous."  After discussing their business initiatives which required her support, Harper directed them to submit their plans to the Plan Commission, and she will advocate to the Plan Commission on their behalf.  Harper told M.F. and SOURCE 2, "You are getting gifts right now because I got to run (for office) this year, so I'm gonna be nice to you."  After the meeting, M.F. told SOURCE 2 Harper was "hungry for donations" and that they should pay her $500.

40.     On January 18, 2019, SOURCE 2 met with Mitchell for lunch.  SOURCE 2 asked for guidance on how to get money to Harper in a way that will keep it "hush hush."  Mitchell said he would talk to Harper and let him/her know.

41.     On January 24, 2019, SOURCE 2 called Mitchell.  Mitchell said he recently talked to Harper and she said she would support his/her SUP for an internet café on Central Avenue.  Mitchell said it was a "Christmas present" and a one-time deal.  SOURCE 2 asked Mitchell how much he/she owed Harper for her support and how should he/she pay it.  Mitchell said they could work out "some kind of legal fee agreement between you and me."

42.     On January 29, 2019, SOURCE 2 called Mitchell.  SOURCE 2 again inquired how to pay Harper the money.  Mitchell said he wanted to avoid the appearance of a "quid-pro-quo."  SOURCE 2 suggested they call the payment a fee for "legal advice."  Mitchell agreed. SOURCE 2 asked if other council members would support the plan and Mitchell told him/her that since the project was in Harper's district, that the others would likely follow her lead.

43.     On February 5, 2019, SOURCE 2 met M.F. in person.  SOURCE 2 expressed concern that M.F.'s past bribe of thousands of dollars would make SOURCE 2's $500 bribe look cheap.  M.F. disagreed and said local politicians like M.F. and SOURCE 2 because they are "not cheap," meaning they pay bribes.  SOURCE 2 told M.F. he/she planned to meet with Mitchell the following day.

44.     On February 6, 2019, SOURCE 2 called Mitchell.  Mitchell asked SOURCE 2 if he/she would pay $320 to sponsor a table at an upcoming event for Harper.  SOURCE 2 agreed. SOURCE 2 asked again how he/she should pay Harper.  Mitchell explained he would draft legal documents and SOURCE 2 would pay him for "legal advice."  Mitchell told SOURCE 2 to pay by money order.

45.     On February 14, 2019, SOURCE 2 met with Mitchell at Mitchell's law office located at 338 N. Erie Street, Toledo, Ohio.  SOURCE 2 paid Mitchell a total of $2,825 ($2,000 for Harper for the Central Ave. SUP; $500 for Mitchell; and $320 for Harper for the women's fundraiser[9]) by six different money orders.  After giving Mitchell the money, SOURCE 2 asked if Harper would be satisfied with the amount of money and whether Mitchell "need[ed] anything for [him]self."  Mitchell said, "$500 of that is mine."  Mitchell told SOURCE 2 that Harper

---

[9] SOURCE 2 accidentally added $5 to this total.

would take care of him/her.  Additionally, Mitchell had SOURCE 2 sign paperwork reflecting that the $2,825 was for "legal advice."

46.      Within minutes of SOURCE 2 leaving his office, the FBI observed Mitchell walk to the Key Bank in downtown Toledo.  The FBI later reviewed Mitchell's personal (not an IOLTA[10]) bank account, and confirmed that on February 14, 2019, Mitchell deposited $2,500 of the $2,825 in money orders into two personal accounts, and withdrew $350 cash from the deposited money orders.

47.      On February 15, 2019, SOURCE 2 emailed Mitchell the "contract" Mitchell was going to "review" to provide a cover for the bribe payments.

48.      On March 7, 2019, SOURCE 2 called Mitchell.  SOURCE 2 asked if Harper had received the $2,000.  Mitchell said she had not received it yet, but that Harper knew it was coming.

49.      On March 21, 2019, SOURCE 2 called Mitchell.  SOURCE 2 told Mitchell he received a few letters from the City of Toledo regarding his/her Central Avenue SUP and the letters alleged that the business is too close to a library and school.  SOURCE 2 said he/she would email the letters to Mitchell.  Mitchell said he would check his email and give SOURCE 2 a call.

50.      On March 22, 2019, Mitchell emailed SOURCE 2 using a Hotmail email address asking more questions about the Central Ave SUP location and whether it was within 1,000 feet

---

[10] An IOLTA is an acronym for "Interest on Lawyer Trust Accounts."  It is also referred to as a "client trust account."  Ohio laws and regulations require a lawyer to hold property of clients or third persons that is in a lawyer's possession in connection with a representation, separate from the lawyer's own property.

of a school, public park, public library or childcare center.  SOURCE 2 responded to the email

stating that it was not.

51.    On March 25, 2019, SOURCE 2 called Harper.  They discussed the pending SUP

for SOURCE 2's internet café on Central Avenue.  Harper said she was having difficulty getting

the requisite votes because people were against the proposed business.  Harper explained which

councilpersons were a definite "yes" vote and those she was working to persuade.  SOURCE 2

asked her if she had met with Mitchell.  Harper said yes and that they were "cool."  Harper said

she would keep SOURCE 2 informed about the votes.

52.    On April 19, 2019, Mitchell withdrew $2,000 cash from his personal bank

account.

53.    On May 30, 2019, SOURCE 2 called Mitchell.  SOURCE 2 asked about his/her

SUP for the Central Avenue internet café.  Mitchell confirmed all would proceed smoothly soon.

54.    On June 6, 2019, SOURCE 2 spoke with Harper at one of her fundraisers.

SOURCE 2 asked if she had received the money from Mitchell.  Harper said, "Yes! Yeah…"

She then confirmed that she was willing to solicit the requisite votes from the other

councilpersons for SOURCE 2's SUP to pass.

55.    On December 2, 2019, SOURCE 2 called Harper.  SOURCE 2 reminded Harper

that his/her SUP for the Central Avenue internet café would be before the Plan Commission on

December 5, 2019, and then proceed to full vote with City Council.  SOURCE 2 reminded

Harper of the previous bribe payment through Mitchell and Harper said, "I know what's going

on. I got your back.  I'm gonna try to work it for you!"  SOURCE 2 asked her if she needed

anything more from him/her.  Harper said, "Nope, I'm cool."

56.     On December 11, 2019, SOURCE 2 met with Harper at One Government Center. Harper told SOURCE 2 that "they are loading up against ya!"  Harper explained that a man who used to lead the "Block Watch" program for that neighborhood obtained signatures in opposition of the SUP request.  Harper instructed SOURCE 2, "You need to hold that up until we can figure something out . . . they are loading up on you!  We gotta do something, we gotta do something . . . ."

57.     On January 2, 2020, SOURCE 2 met with Harper at her office in One Government Center.  They discussed SOURCE 2's pending SUP for the internet café on Central Avenue.  Harper said, "Let me tell you what's going on: dude is getting signatures against you!"  She elaborated that the local "Block Watch" leader had a "pretty strong" opposition to this proposed internet café SUP, and he is getting the church leader nearby involved.  Harper said, "You need to get with, get some support . . ., you'll want to get a letter because there's a school down there and then you'll need to talk to somebody at the library.  I'm telling you what to do to help you out because this guy is pretty strong, and I probably won't have the votes on the floor."  Harper proposed that her legislative assistant put SOURCE 2 in touch with the "Block Watch" leader to work things out.  While leaving, SOURCE 2 told her "alright Yvonne [Harper], we're gonna count on you!  Do everything you can, huh?"  Harper reassured him/her, "I will, but we need you to talk to him (the "Block Watch" leader)."

58.     On January 6, 2020, SOURCE 2 randomly encountered Harper outside of a restaurant in downtown Toledo.  Harper told SOURCE 2 that her aide said he had to find SOURCE 2 the information[11].  Harper reassured SOURCE 2 his/her SUP for the internet café on

---

[11] This is a reference to their January 2, 2020 meeting where Harper instructed her aide to give SOURCE 2 the "Block Watch" leader's information.

Central Avenue would pass.  She said, "Look, we don't have a problem.  We just wanna get our shit in order and just go talk to that person so they don't come out on us."  SOURCE 2 replied, "I just need that name and you gonna do everything you can with a few city council, we got it made!"  Harper concluded, "I ain't worried about that part."

59.     On January 8, 2020, SOURCE 2 attended the Zoning and Planning Committee meeting for his/her Central Avenue internet café SUP.  When SOURCE 2 arrived, Harper approached him/her and said that she was going to postpone the vote to the following month because she had not yet secured the requisite votes for it to pass.  When the SUP came on the agenda minutes later, the deputy clerk announced that it was recommended for disapproval by the Toledo Plan Commission.  Harper was the lone member of council to speak, and she requested the vote be delayed for an additional 30 days.  The committee accepted Harper's delay request and announced it would be addressed a month later on February 12, 2020.

60.     On January 23, 2020, SOURCE 2 met with Harper at her office in One Government Center to discuss the Central Avenue internet café.  SOURCE 2 told Harper that he/she used his/her relationship with some doctors at the hospital to ensure the hospital does not oppose the SUP.

61.     On February 7, 2020, Harper called SOURCE 2.  Harper said she needed him/her to sponsor two tables at an upcoming event totaling $640.  SOURCE 2 agreed to pay the money.

62.     On February 12, 2020, SOURCE 2 called Harper.  SOURCE 2 reminded Harper that his/her SUP for the internet café on Central Avenue would be addressed at the Zoning and Planning Committee meeting later that day.  Harper agreed to see him/her that afternoon, and directed SOURCE 2 to make out money orders totaling $640 to "Perry Burroughs Democratic Women's Club."

63.     On February 12, 2020, SOURCE 2 provided the requested money orders totaling $640 to Harper's assistant while inside Council chambers.  Moments later, Harper sat on the Planning Committee and advocated for SOURCE 2's SUP.  Johnson and Sykes each asked a question to SOURCE 2 and indicated they were satisfied with SOURCE 2's answers.  Harper ultimately made a motion to the committee to send the SUP forward as approved with necessary waivers, to full City Council for a vote.

64.     On February 25, 2020, during a City Council meeting, Harper voiced her support for the SUP and spoke favorably about SOURCE 2's business operations.  She urged Council to pass the measure, stating in closing to her voting peers on Council, "That's why I'm asking for support. . . ."  When put to a vote, Harper voted in the affirmative and SOURCE 2's Central Avenue SUP passed unanimously.

65.     On March 10, 2020, SOURCE 2 saw Harper at One Government Center.  Harper approached SOURCE 2 and talked about SOURCE 2's SUP for an internet café on Central Avenue.  Harper said, "We got your shit through, didn't we? . . . Did you see how I did it?"  SOURCE 2 replied, "You did it. . . ."  Harper said, "I smoothed it in, did you see? . . Nobody said nothing. . . But did you see how, uh, after I said what I said , did you see how [another City Councilperson] came right (unintelligible) me, and used the same shit?"  SOURCE 2 told her, "You did wonderful. Thank you. Thank you."  Harper told SOURCE 2 she had received complaints about her approval of this SUP from a nearby church but dismissed the complaint by telling the church employee, "When did hoes, whores become so faithful?"  SOURCE 2 thanked her for getting the matter approved.

### b. Bribe Payment to Johnson

66.     On January 2, 2020, SOURCE 2 was at One Government Center to meet with

Harper as discussed in paragraph 57. While there, Johnson called SOURCE 2 into his office.

Johnson asked SOURCE 2 to put him in contact with SOURCE 2's business associates so he

could obtain permission to put his sheriff campaign signs at their businesses. SOURCE 2 said

he/she would facilitate that request for Johnson, and then he/she informed Johnson that he/she

had pending SUP requests for internet cafés up for a vote that very day. Johnson expressed his

support to vote in the affirmative for them.

67.     On January 3, 2020, SOURCE 2 called Johnson. The two agreed to meet on

Monday, January 6, 2020 for lunch at a Toledo restaurant.

68.     On January 6, 2020, SOURCE 2 met with Johnson for lunch in downtown

Toledo. SOURCE 2 explained he/she has a pending matter before City Council regarding an

internet café on Central Avenue within Harper's district. Johnson said he did not have an issue

approving the matter so long as it was more than a thousand feet away from any school. After

expressing his support, Johnson told SOURCE 2 that he is "gonna have a fundraiser first week of

February, so I'll let you know. . . ." SOURCE 2 agreed to go to the fundraiser and told Johnson

he/she wanted to talk to him outside. While walking to the parking lot, SOURCE 2 said, "Uh, I

didn't want to do it inside, can I, uh, put a thousand dollars for you from my behalf to you?"

Johnson said yes. SOURCE 2 directed Johnson to his vehicle. At this time, SOURCE 2 and

Johnson ran into Harper outside the restaurant. Their conversation is detailed in paragraph 58.

While standing outside of SOURCE 2's vehicle, he/she attempted to give Johnson $1,000 in

cash. Johnson said he could not accept the cash, adding: "No, in fact, I, you know, I got, 'cuz,

I'd have to report it and you don't want your name on there right?" SOURCE 2 agreed he/she

did not want his/her name associated with the money.  Johnson then instructed SOURCE 2 how to give him the money in a more discrete fashion stating, "If you can do that, like have, get a check from somebody else to write the check, and then donate it to the campaign."  SOURCE 2 agreed to figure out something.

69.     On January 9, 2020, SOURCE 2 called Johnson and told him he/she had a $1,000 check for him in someone else's name.  They agreed to meet the following day.  Later that same day, Johnson called SOURCE 2 to tell him/her that the neighboring hospital may get involved and object to his/her SUP for Central Avenue.  Johnson said it would "make it a little more difficult" for Johnson to pass the SUP if the hospital objected.  Johnson asked SOURCE 2 to smooth it over with the hospital before the vote.

70.     On January 10, 2020, SOURCE 2 met Johnson at a Toledo restaurant.  SOURCE 2 told Johnson he/she had a check signed by his/her "cousin[12]."  Johnson told him/her to make the check to "Citizens to Elect Gary Johnson."  SOURCE 2 filled out the check and gave it to Johnson.  SOURCE 2 cautioned Johnson, "But please, nobody knows about this.  I don't want, because if [Johnson's competitors for sheriff] find out, and gonna ask me, 'how come you didn't'…"  Johnson said, "Whoever's name is on the check, that's the name and address that goes on the campaign (financial paperwork)."  SOURCE 2 then told Johnson that he/she talked to certain doctors at the hospital, and the hospital would not object to his/her SUP for an internet café on Central Avenue.  SOURCE 2 told Johnson that Harper also supported it.  Johnson said, "Well if Yvonne [Harper] is making a recommendation to approve, we can follow her, yeah, I

---

[12] The check was in the name of SOURCE 2's associate, referred to in this affidavit as "A.M."  SOURCE 2 paid A.M. $1,000 cash and A.M. signed a check for $1,000 and handed it to SOURCE 2 to give to Johnson. SOURCE 2 and A.M. are not related.

mean, she's the district council person so. . ." As they were leaving, SOURCE 2 said, "Alright Mr. Gary, I know I'm in good hand… W. Central is in your hand." Johnson said it was in "Yvonne's hands" but he did not "see an issue with it as long as there's not nobody protesting it."

71.     On January 23, 2020, Johnson called SOURCE 2.  SOURCE 2 told Johnson the locations where his/her associates would permit Johnson to post his sheriff campaign signs. SOURCE 2 told Johnson that his Central Avenue SUP was up for a vote in February.  Johnson said he would talk to Harper and "I'll vote with her, whatever she does, I'm voting with her." SOURCE 2 thanked Johnson for "looking out for me."

72.     On February 25, 2020, just prior to a City Council meeting, Johnson met with SOURCE 2 in his office at One Government Center.  Johnson thanked SOURCE 2 for all he/she does for Johnson.  During the City Council meeting, Johnson voted yes for SOURCE 2's Central Avenue SUP.

### c.  Bribe payment to Riley

73.     On October 11, 2019, Riley called SOURCE 2 and said he needed to raise some money, "I need to raise about five grand!"   SOURCE 2 said he/she would see what he/she could do, but he/she needed Riley's help on SOURCE 2's SUP for Central Avenue.  Riley professed his support for the SUP.  SOURCE 2 said, "You scratch my back, I'll scratch your back."  Riley said, "I'm in."  Later that day, the two agreed to meet for lunch.

74.     On October 15, 2019, SOURCE 2 and Riley met at a local restaurant.  The two discussed the SUP for Central Avenue.  In the parking lot, SOURCE 2 gave Riley $5,000 cash, which they hid in a magazine.

75.     On October 18, 2019, Riley met with SOURCE 2, and citing trust issues with SOURCE 2, Riley temporarily returned the cash, but told him/her to hold on to the $5,000 for him, because Riley "had a plan" for the money.

76.     On October 29, 2019, SOURCE 2 and Riley met at a local restaurant.  Riley took the $5,000 cash back, and told SOURCE 2 that he was taking this as "a loan" with no interest rate and payment was due by the end of 2024[13].  When handing Riley the cash, some of the money fell to the ground and Riley hastily picked it up from the parking lot.  Citing concerns for cameras in the parking lot, Riley handed the cash back to SOURCE 2 and they decided to transfer the money in a different parking lot a couple of blocks away.  Upon arrival at the new location minutes later, Riley once again accepted the $5,000 from SOURCE 2.

77.     The FBI reviewed Riley's bank accounts through April 2020 and did not find any cash deposits for $5,000.

78.     On February 25, 2020, Riley voted yes for SOURCE 2's Central Avenue SUP.

**d. Bribe payments to Sykes**

79.     On May 22, 2019, SOURCE 2 met with Sykes briefly and mentioned needing his assistance for the Central Avenue SUP.  SOURCE 2 stated, "And whatever 'Dr.' Sykes orders…I got you!"  Sykes replied, "OK.  Alright."

80.     On July 12, 2019, SOURCE 2 called Sykes to discuss upcoming Council votes. Sykes said he was fishing in Michigan and that they could meet the following week for lunch.

81.     On July 17, 2019, SOURCE 2 met with Sykes for lunch at a local restaurant. They discussed a few different items: SOURCE 2's SUP for an internet café on Central Ave. and

---

[13] Riley is term-limited out of his position on City Council in the year 2024.

moratorium legislation to eliminate future competing internet cafés[14].  After their meal, in the parking lot, SOURCE 2 told Sykes he/she had $1,000 for him. SOURCE 2 handed SYKES the cash, but inadvertently gave Sykes $800 after vocalizing that it was $1,000.  Sykes said he would take the money, but referred to it as a "campaign contribution." As SOURCE 2 was driving away, SOURCE 2 realized he/she only gave Sykes $800 instead of the $1,000 he/she vocalized. SOURCE 2 called Sykes on the telephone.  He/she advised Sykes that he/she just realized the mistake of only providing Sykes $800.  Sykes acknowledged that he had received only $800. SOURCE 2 responded that he/she would give the extra $200 at a future meeting and that he/she needed Sykes to vote for the Central Avenue SUP.

82.     On August 9, 2019, SOURCE 2 met with Sykes briefly alone at a restaurant before they were joined by Riley.  SOURCE 2 spoke at length about his/her Central Avenue internet café in addition to his/her request for moratorium legislation.  SOURCE 2 gave Sykes the aforementioned $200 cash in furtherance of the moratorium legislation, and Sykes accepted it without hesitation.  SOURCE 2 then gave Sykes an additional $500 cash for his pledged affirmative vote for the Central Avenue SUP.  Sykes accepted the $500 without hesitation.

83.     The FBI reviewed records of "Larry J Sykes Committee to Elect Larry Sykes" bank account.  There were no cash deposits from July 17, 2019 through April 2020.

84.     On February 25, 2020, Sykes voted yes for SOURCE 2's Central Avenue SUP.

**D. SOURCE 2's two Reynolds Road internet cafés and moratorium legislation**

85.     In approximately September 2019, SOURCE 2 applied for SUPs for two (2) internet cafés on Reynolds Road.   During the same approximate time period, SOURCE 2

---

[14] The moratorium is discussed in more detail in Section D.

wanted City Council to pass a moratorium to prohibit any additional internet cafés within the city for a specified time frame. SOURCE 2 paid Sykes $1,000 in bribe money for three votes in favor of the two internet cafes on Reynolds Rd., the moratorium legislation, and paid Riley $5,500 in bribe money for his three votes in favor of these issues.

### a. Bribe payments to Sykes

86.     On July 17, 2019, SOURCE 2 met with Sykes and the two discussed possible legislation for a moratorium on future internet cafés in Toledo. This meeting was detailed in paragraph 81.

87.     On August 8, 2019, SOURCE 2 called Sykes. They confirmed meeting the next day with Riley. SOURCE 2 asked to meet with Sykes alone just prior to the meeting to give him the remainder of the money promised from their previous meeting.

88.     On August 9, 2019, SOURCE 2 met with Sykes, as previously detailed in Paragraph 81. SOURCE 2 discussed his/her request for an internet café moratorium. SOURCE 2 gave Sykes $200 cash and Sykes accepted it without hesitation. SOURCE 2 immediately gave Sykes an additional $500 in cash for his/her Central Avenue SUP as discussed in Part C of this affidavit. Riley then joined the two for lunch, and they all discussed the moratorium and the Reynolds Road locations.

89.     On August 22, 2019, SOURCE 2 called Sykes to discuss the moratorium. Sykes said he was going to draft the legislation the following week.

90.     On September 2, 2019, SOURCE 2 called Sykes. Sykes told SOURCE 2 that he was working on the moratorium and would bring it up with City Council the following day.

91.     On September 13, 2019, SOURCE 2 met with Sykes. They discussed the moratorium and Sykes advised SOURCE 2 on how to get it passed. SOURCE 2 informed Sykes

that a competing business may open in the plaza at Dorr and Reynolds in Toledo, and informed Sykes that competing businesses are "popping up like crazy now." SOURCE 2 said, "So how (are) we doin' on that moratorium?" Sykes replied, "Uh, this (paperwork) is part of the process of putting that together." Later in the conversation, Sykes said, "When we start this process, have your stuff in order, because they're gonna start looking at everything." SOURCE 2 asked about the timing of the moratorium, "So after that, you gonna . . . (vote on the moratorium legislation)?" Sykes said, "We're going through the process (of drafting the legislation) now."

92.    On September 26, 2019, SOURCE 2 called Sykes. SOURCE 2 stressed he/she wanted the moratorium soon to eliminate his/her competition. Sykes said he understood.

93.    On October 17, 2019, SOURCE 2 called Sykes. Sykes told him/her the moratorium legislation was "a little complicated, but [he's] working on it." SOURCE 2 told Sykes about competitors possibly opening in the area. Sykes said he would look into it. Later that day, Sykes called SOURCE 2 and said he talked to the deputy clerk of council and "told her I wanted to cease, eh, put a moratorium on anymore damn internet casinos opening up." SOURCE 2 again stressed the importance of this issue and Sykes said, "I'll draft up the legislation, just sayin' hell, I'm gonna passin'. . ."

94.    On December 2, 2019, SOURCE 2 called Sykes. Sykes said he had "a package" for SOURCE 2, referring to the moratorium, but that it will not be final until later this month. SOURCE 2 reminded Sykes that he/she had two (2) Reynolds Rd. SUPs up for a vote soon. Sykes pledged his affirmative votes for the SUPs.

95.    On December 10, 2019, SOURCE 2 called Sykes. Sykes told SOURCE 2 that as of January 1, 2020, "everything is shut down, no more" referring to the opening of new internet cafés. SOURCE 2 asked, "What do you mean shut down?" Sykes said, "We're going eliminate,

no more, you can't apply for no, anymore, internet cafés." Sykes said it will be voted on during the first week in January, and the only reason it was not in December was due to the volume of agenda items already on the docket for December's meeting and the holidays. SOURCE 2 expressed his/her gratitude.

96.    On December 18, 2019, SOURCE 2 called Sykes. SOURCE 2 discussed how SOURCE 2 should be good for the upcoming City Council vote in the beginning of January. Sykes agreed with SOURCE 2 saying "Yeah, yeah, that's done." SOURCE 2 reminded Sykes that the last time they spoke with each other, Sykes told SOURCE 2 that he had a "package" for him/her. Sykes informed SOURCE 2 that he will pass a moratorium on any new internet cafés. SOURCE 2 was happy to hear that news.

97.    On January 2, 2020, Sykes voted yes on a moratorium on internet cafés and the two (2) Reynolds Road SUPs; all three (3) measures passed.

98.    The FBI reviewed records of "Larry J Sykes Committee to Elect Larry Sykes" bank account. There were no cash deposits from July 17, 2019 through April 2020 .

**b.    Bribe payments to Riley**

99.    On August 9, 2019, as mentioned in paragraphs 82 and 88, SOURCE 2 met with Sykes and Riley for lunch. After the meal when Sykes departed the table, SOURCE 2 slid $500 cash to Riley under a napkin. Riley accepted the money and said he would support the projects discussed, which included the moratorium legislation. Referring to his/her competing internet cafés, SOURCE 2 told Riley during their conversation, "You know, because, I'd be lying to you, if a few of them open, it's gonna take away some of the business." Riley responded, "Yeah, yeah, absolutely."

100.    During the telephone call on October 11, 2019 referenced in paragraph 73, SOURCE 2 complained to Riley about Sykes's slow progress in introducing legislation to place a moratorium on internet cafés.  Riley advised he would talk to Sykes on SOURCE 2's behalf. Riley indicated he planned to hold a fundraiser in approximately 10 days and asked SOURCE 2 how much money he intended to contribute prior to the election.

101.    On January 2, 2020, RILEY voted in the affirmative for the internet café moratorium and the two Reynolds Road SUPs sought by SOURCE 2.

### E.  A.M.'s Manhattan Blvd. internet café

102.    An acquaintance of SOURCE 2, A.M., approached him/her about opening an internet café on Manhattan Blvd.  A.M. knew SOURCE 2 owned many similar establishments and wanted his/her input on how to get it approved by Council.  The proposed location was in Harper's district.

103.    On April 10, 2019, SOURCE 2 met with A.M. and told A.M. that he would need to bribe Harper to get her support.  A.M. told SOURCE 2 he was open to paying Harper whatever was necessary.

104.    On April 17, 2019, SOURCE 2 called Mitchell and told him that he/she had a businessman who wanted to open up a business in Harper's district and that he/she already informed the businessman (A.M.) that he might have to pay a bribe to get Harper's support. Mitchell did not object to SOURCE 2's suggestion that a bribe payment was necessary.

105.    On May 7, 2019, SOURCE 2 called Mitchell.  SOURCE 2 told Mitchell that the businessman was wealthy and was willing to pay to get the project approved.  Mitchell said Harper was "iffy" on supporting the project.

106.    On May 16, 2019, SOURCE 2 met with Mitchell for lunch at a local restaurant. Mitchell told SOURCE 2 that Harper would support A.M.'s project so long as he provided the proper documentation and donated a significant amount to Harper's campaign. Mitchell said, "Not a certain amount, but, it ought to be substantial, and by substantial would mean five to ten grand." Mitchell further instructed that the checks should be made to "Harper for Council District 4." In an effort to disguise the bribe payments, Mitchell then asked SOURCE 2 to get some "contracts" from A.M. so he could "review" them.

107.    On May 21, 2019, SOURCE 2 had lunch with A.M. SOURCE 2 relayed Mitchell's request that A.M. pay Harper $5,000 in order to get his Manhattan Blvd. internet café approved.

108.    On May 22, 2019, SOURCE 2 called Mitchell. The two discussed A.M.'s business plan. SOURCE 2 asked Mitchell, "Do we need to do, uh, one of those contracts, one of those phony things, or whatever you want to call it?" Mitchell answered, "Yep, well, um, that, that would be nice." SOURCE 2 asked if Mitchell needed a separate fee. Mitchell said he needed $1,500 for his "legal work." SOURCE 2 confirmed that A.M. needed two (2) checks: one (1) to Harper for $5,000 and one (1) for Mitchell for $1,500. Mitchell agreed. SOURCE 2 asked Mitchell to email him the details of the fundraiser where the exchange of money would occur.

109.    On June 3, 2019, SOURCE 2 called Mitchell, and Mitchell confirmed the date of Harper's fundraiser where A.M. would pay the $6,500. They agreed to meet there.

110.    On June 6, 2019, SOURCE 2 and A.M. went to Harper's fundraiser. A.M. had one $5,000 check for "Harper for City Council- District 4" and one $1,500 check for Mitchell. They went into the fundraiser and gave the checks to Harper's staff at the front table. SOURCE

2 and A.M. talked to Harper.  SOURCE 2 told Harper, "We're gonna need the votes" and Harper

confirmed that she was "gonna get the votes!"

111.    The FBI reviewed "Harper for City Council- District 4" and Mitchell's bank

accounts.  On June 12, 2019, the $5,000 check from A.M. was deposited into Harper's campaign

account.  On June 14, 2019, Mitchell deposited the $1,500 check from A.M. into his personal

account.

112.    On July 3, 2019, SOURCE 2 called Mitchell to confirm that A.M.'s checks were

received.  Mitchell confirmed they had received the checks and that nothing further was needed

at that time.  SOURCE 2 then told Mitchell that Harper needed to get the requisite votes when

A.M.'s SUP is before City Council.

113.    On July 23, 2019, SOURCE 2 called Mitchell to talk about A.M.'s SUP before

Council later that day.  SOURCE 2 reminded Mitchell that A.M. wrote him a $1,500 check.

Mitchell said he believed the vote was in "good shape" and that he would call Harper to remind

her.

114.    On July 23, 2019, Harper voted in favor of A.M.'s SUP during the City Council

meeting.  A.M.'s SUP was approved unanimously.

**F.  SOURCE 1's Sprinkler Waiver**

115.    When Council approved SOURCE 1's "curb cut," the City required that

SOURCE 1 pay for, and install, a sprinkler system on the property.  SOURCE 1 did not want to

pay for the sprinkler system prior to the construction of the "curb cut" because he/she feared the

construction would destroy the sprinkler system forcing SOURCE 1 to pay for it again, and

he/she did not want to incur this additional cost for the business.  SOURCE 1 vented this

frustration to Riley and explained that he/she paid Riley bribes totaling $1,700 ($700 combined

from payments on May 24, 2019 and June 5, 2019; $500 on August 28, 2019; and another $500

on January 31, 2020) so Riley could remove the sprinkler system condition of his/her approved

SUP.

116.    On May 24, 2019, Riley solicited from SOURCE 1, $600 to pay for a campaign

fundraiser breakfast the following morning.  SOURCE 1 provided Riley $600 in cash on the

spot, and among other things discussed, SOURCE 1 requested Riley's assistance in waiving the

sprinkler system requirement associated with the approved "curb cut" SUP.  In response, Riley

stated, "I will look into it to see what's the problem."

117.    On June 5, 2019, Riley requested to meet once again with SOURCE 1.  Riley said

he could not take the $600 in cash, and requested instead, a $500 check from SOURCE 1, paid to

Riley's campaign.   Although intimating that he was returning the entire $600 he took from

SOURCE 1 on May 24, 2019, Riley only handed $400 in cash back to SOURCE 1.  During their

conversation, SOURCE 1 again requested assistance from Riley to obtain a waiver for the

sprinkler system requirement associated with the approved "curb cut" SUP.   Riley indicated that

he would personally intervene on SOURCE 1's behalf.  In all, Riley solicited a total of $700

from SOURCE 1 ($200 in cash kept from the May 24, 2019 meeting and an additional $500

check taken from SOURCE 1 on June 5, 2019).

118.    On August 2, 2019, SOURCE 1 called Riley.  Riley told SOURCE 1 he had a

fundraiser coming up and that he needed SOURCE 1's support by donating $500.  SOURCE 1

agreed and asked for Riley's help in removing the sprinkler system condition of his/her SUP.

Riley said he would look into it and get back to SOURCE 1.

119.    On August 28, 2019, Riley went to SOURCE 1's business.  Riley said he spoke

with the Plan Commission about the sprinkler system.  Riley conveyed that the Plan Commission

agreed that it did not make sense to install the system before construction. Riley then asked
SOURCE 1 to pay $500 by check to cover the cost of a campaign event. Riley asked SOURCE
1 to write the check directly to the nightclub where he was hosting the fundraiser. SOURCE 1
wrote the check but left the name field blank. The FBI subsequently reviewed SOURCE 1's
banking documents and saw the check was made out to the owner of a Toledo nightclub.

120.   On September 6, 2019, SOURCE 1 called Riley to further discuss the sprinkler
system issue. Riley went over details of his conversation with an employee within the Toledo
Plan Commission, and said he would assist SOURCE 1 in convincing the Director of the Plan
Commission to waive the sprinkler requirement.

121.   On January 31, 2020, Riley solicited another $500 from SOURCE 1 in the form
of a money order purportedly to pay a caterer for an event Riley held for constituents earlier that
morning. As SOURCE 1 handed Riley the $500 money order, SOURCE 1 again asked for
resolution on obtaining a waiver for the sprinkler system requirement. Riley responded in part,
"I'll talk to them, and I'll have some information by this time next week."

122.   On February 4, 2020, Riley told SOURCE 1 that a Plan Commission official said
removing the sprinkler system condition from his SUP should not be a problem, and that he
scheduled a meeting with the Plan Commission Director on February 18, 2020.

123.   On February 18, 2020, Riley alleged to have convinced the Director of the Plan
Commission to remove the sprinkler system condition from SOURCE 1's "curb cut" SUP and it
was formally removed.

124.   The FBI reviewed "Riley for City Council" and "Tyrone and Gloria Riley" bank
accounts. On June 5, 2019, SOURCE 1 issued a $500 check made out to "Friends of Riley" and
on July 8, 2019, Riley deposited this check into his "Riley for City Council" account.

Additionally, on February 3, 2020, the $500 money order purchased on January 31, 2020 by SOURCE 1 was deposited into Riley's personal account "Tyrone and Gloria Riley."

### G. A.M's Secor Road internet café

125.    In December 2019, A.M. filed for an SUP to open an internet café on Secor Rd. On February 13, 2020, the Plan Commission recommended rejecting the SUP.  On April 15, 2020, the Zoning and Planning Committee forwarded the SUP for a full City Council vote with no recommendation stating the proposed location was within 1,000 feet of a park.

126.    On April 20, 2020, SOURCE 2 and Johnson spoke on the telephone.  Johnson told SOURCE 2, "I'm glad you called . . . I'm trying to raise about $2,000 more to finish this thing off (his sheriff's campaign), and I was wondering if you could help out anything... And I'm not looking for the whole $2,000 from you.  Just whatever you can do."  SOURCE 2 told Johnson he/she would call him back later that night and see what he could do for him.

127.    That same day, SOURCE 2 called A.M. and explained they needed to bribe Johnson.  SOURCE 2 said he/she was going to give A.M. $1,000, and then, A.M. would write a check to Johnson for $2,000.  A.M. agreed to do so.

128.    Later that night, SOURCE 2 called Johnson back.  SOURCE 2 told Johnson he/she and A.M. "can help" him financially and that tomorrow there was a City Council vote for A.M.'s Secor Rd. internet café.  While talking to SOURCE 2, Johnson looked up the specifics of the SUP and said he did not see a reason to vote against it, but asked what Riley intended to do. SOURCE 2 said Riley intended to support the SUP.  SOURCE 2 then asked Johnson to do "whatever he can" to influence the other council members and not to worry about his campaign shortfall, "Me and [A.M.] are gonna take care of it (pay JOHNSON the entire $2,000).  I'll just uh, I can't show I'm giving you a lot, because, you know [Johnson's sheriff competitors] gonna

get on my ass." SOURCE 2 elaborated, "Yeah, what I can do is get you a money order, or I'll

give [A.M.] $1,000, and [he/she will] write you a check for $2,000 because [he/she is] gonna

'donate' $1,000 because you're gonna help out on that. So that should take care of that

(campaign shortfall) for you." Johnson expressed support for the SUP and A.M's "small

business" and they agreed to meet soon to exchange the money.

129.    On April 21, 2020, City Council voted on A.M.'s Secor Rd. internet café. A.M.

needed a super majority of nine (9) votes for the measure to pass because the Plan Commission

recommended rejecting the SUP. Johnson and six (6) other city council members including

Harper, Riley, and Sykes voted in favor of the SUP. Five (5) city council members voted against

the SUP. The SUP failed.

130.    On April 22, 2020, SOURCE 2 met Johnson. Johnson said he tried to garner

support for A.M's SUP, "I tried. I called a couple of people and said 'Hey, where you at on this?'

and most of them (city council members) said 'we're gonna follow the District's councilman's

lead, so I called, um, what's his name (the district councilperson)." SOURCE 2 told Johnson he

appreciated his support and told Johnson, "I got $2,000 cash, keep me off the radar, nobody

knows. Or, if you want a check, whatever, you tell me. I'd rather nobody knows about 'cuz

please, if [other candidates for Lucas County Sheriff] find out I gave you more, they're gonna be

pissed." Johnson said, "Alright, let's do the cash, but this has gotta stay between you and me."

SOURCE 2 gave Johnson twenty (20) $100 bills. Johnson counted the money to ensure it was

$2,000. SOURCE 2 asked if A.M. can appeal City Council's decision. Johnson told SOURCE 2

to call the Director of the Plan Commission because "you don't want it to come through one of

us (City Councilpersons), 'cuz it's gonna look like a quid-pro-quo. . . and so if they (Plan

Commission) say 'yes you can re-appeal it,' then you find out 'what do I have to do.' Get it back

in the hopper then talk to us (City Council) . . ." Johnson said if it came back up for a vote, he could "work on a few people and get that done." SOURCE 2 provided Johnson A.M.'s telephone number so Johnson could thank him for the $1,000.

### H. Harper's Extortion of SOURCE 1

131.    On November 26, 2019, one of Harper's constituents referred to in this affidavit as R.S., made a Facebook post about a gas station near downtown Toledo, which was in Harper's district. R.S. alleged that an employee of that gas station used racial slurs when interacting with a female customer from the neighborhood. SOURCE 1 owned the building and leased it to another local businessman. After this social media post by R.S., there were negative remarks on the internet and in-person protests surrounding this gas station. On December 13, 2019, Harper convened a meeting with SOURCE 1, R.S., Sykes, and other area leaders. They discussed the incident and how to resolve it. Harper suggested that SOURCE 1 provide a financial benefit to R.S. R.S. explained to SOURCE 1 that the children needed warm clothes, and after some discussion concerning the clothing, R.S. asked SOURCE 1 for a monetary payment instead of actual clothing. After some disagreement as to the appropriate amount, on December 31, 2019, R.S. asked SOURCE 1 for $350. In an effort to appease R.S. and to make the protests stop, SOURCE 1 paid R.S. $500.

132.    On January 6, 2020, Harper reconvened a meeting with SOURCE 1, R.S., Sykes, and others. Harper chastised SOURCE 1 for paying R.S. only $500 as she expected more[15].

---

[15] The information provided by SOURCE 1 in paragraphs 131 and 132 was not recorded due to investigators being unaware at the time that Harper intended to extort SOURCE 1 over the incident.

133.    On January 10, 2020, SOURCE 1 called R.S. and indicated that Harper seemed disappointed in their recent meeting about the amount of money he/she paid R.S.  R.S. told SOURCE 1, "listen to me, I don't get disappointed, if I get a dollar, I'm satisfied. . .  She (Harper) feel that I should have got more."  R.S. told SOURCE 1 whatever additional money Harper demands is good with him.

134.    On January 18, 2020, R.S. contacted SOURCE 1 and advised that he is just "the messenger," but that Harper is not happy with the $500 amount SOURCE 1 paid R.S., and said that the issue will not go away until SOURCE 1 pays R.S. more money.  R.S. said he was instructed by Harper to tell SOURCE 1 that if SOURCE 1 does not compensate R.S. more, that "everything is going back on the table" (i.e., protests would resume and there will be more public outcry and media attention to the alleged racial incident at the business, which obviously would negatively affect the business).  Harper told R.S. to tell SOURCE 1 that SOURCE 1 is going back on his/her word and that SOURCE 1 can "do better than that."

135.    R.S. and SOURCE 1 spoke again later that day. SOURCE 1 advised R.S. that Harper is not returning SOURCE 1's calls.  SOURCE 1 stated, "Tell me, what makes Yvonne Harper happy.  What numbers you want?  What does she want me to do?  She will not talk to me.  I, I even told you, I have text messages.  I have called her.  You tell, you ask her and tell me, like you just said that you are a messenger . . . you're just relaying the message . . . ."  R.S. stated, "This is what she told me [SOURCE 1], she said you need to put some more, she said you should have put at least $2,500 on there, she said $500 was unacceptable, she told me, that I saved you guys too much money for $500, that's what she said.  I'm just keepin' it real, that's what she told me. She said she's not talking to you until you do something about it . . . ."  Later in the conversation, R.S said, "I don't ask people for their money man!  You're a good [person];

I come to your stores all the time, but I'm just tellin' you, that's what she said, she said I deserve way more than that ($500), I'm not trying to extort nobody . . . that's coming out of her (Harper's) mouth. I talked to her. She said she's not talking to you until you do it." SOURCE 1 replied, "How much does she (Harper) want sir, so we have a good relationship?" R.S. answered, "OK, she said $2,500." SOURCE 1 inquired whether it was "$2,500 more?" R.S. said, "And it will go away, that is it, $2,500 and that's it. It's over with, and then I'll do the press conference (speak publicly in support of SOURCE 1 and his/her business)." SOURCE 1 said he/she will get back to R.S. soon and asked whether it should be cash or check. R.S. said it's all going to "my kids," citing one having open heart surgery next week. R.S. suggested making a check out to him, or giving him cash and he'll give SOURCE 1 a receipt. SOURCE 1 indicated he/she will be in touch soon.

136. On January 22, 2020, SOURCE 1 called R.S. SOURCE 1 told R.S. that Harper was not accepting his/her calls. R.S. told SOURCE 1, believe me "I talk to her every other day, and she ain't talking to you until you, until she said you do right." R.S. told SOURCE 1 after he/she pays the money, Harper will talk to him/her again.

137. On January 23, 2020, SOURCE 2 met with Harper on behalf of SOURCE 1 in City Council chambers at One Government Center. Harper told SOURCE 2 that SOURCE 1 should have paid R.S. more than $500. She then directed SOURCE 2 to inform SOURCE 1 that he/she needs to pay R.S. $2,500.

138. On January 28, 2020, Harper called SOURCE 1. Harper admitted to SOURCE 1 that she was intentionally not accepting his/her calls. In part, SOURCE 1 informed her that his/her business partner questioned if they don't pay, what could Harper do to their business. SOURCE 1 told Harper that he/she informed his/her business partner that Harper can do a lot of

things to their business, explaining to Harper, "That's why I've been calling you every other day or 2-3 times a week . . . . " Harper confirmed, "I avoided you, because I didn't want to be very nasty, in different communities; you got to deal things differently. Out in Sylvania, it's completely different. Out in um, district five over there by T.U. (University of Toledo), it's different areas. But in the area that I hit at (District 4), they be nasty to me too!" SOURCE 1 said, "I hope you understand my position too. Ma'am, I, do tell [SOURCE 1's business partner] you know, I need to be nice to Yvonne, I need to be nice to this (person). But her argument is, what did you (SOURCE 1) do wrong? What are they going to do to you or to the business? And I want to take it back to [him/her] and say hey, this is what they can do to the business and do to us . . . ." Harper said, "Well let me tell you. They can do, look at the street with, what she (recounting that SOURCE 1's partner asked what Harper) can do to your business? Tell [him/her] to go down there on Bancroft and Franklin[16] where the man is selling their place. They lost their liquor license. They have no business in there. Oh, it can be done! They can do, you can get a bad name, and I'm tell [R.S.] to contact you. You and [R.S.] get together and you guys can work that out. Get him the money. Okay?" SOURCE 1 concluded, "Okay ma'am alright ma'am."

139.    On January 31, 2020, SOURCE 1 paid $2,500 to R.S. by check. SOURCE 1 confirmed that this was the extent of the money that needed to be paid and he did not want any further problems at that gas station. R.S. said SOURCE 1 would not have more problems.

---

[16] This refers to a business formerly located on Bancroft Street near Franklin Avenue in the city of Toledo. In December 2018, a video was posted to social media that depicted the store owner and others beating an African American man alleged to have stolen a bottle of liquor. This video prompted online and in-person protests. Harper sought advice from other local political figures on how to get this store's liquor license removed. Ultimately, the store lost its liquor license, which effectively ruined the business.

Additionally, SOURCE 1 told R.S. he/she needs "Yvonne's vote I want you to talk to her please." R.S. said he would.

140.    On February 3, 2020, R.S. cashed the $2,500 check from SOURCE 1 at a local bank location.

## CONCLUSION

141.    Based on the foregoing, your Affiant respectfully submits there is probable cause to believe that Tyrone Riley, Yvonne Harper, Larry Sykes, Gary Johnson, and Keith Mitchell violated Title 18, United States Code, Section 666(a)(1)(B) and 1951.  Additionally, your Affiant submits there is probable cause to believe that Yvonne Harper violated Title 18, United States Code, Section 875(d).

Respectfully submitted,

Matthew Cromly
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to telephonically
after being submitted by reliable electronic means
on June 30, 2020.

Honorable Jeffrey J. Helmick
UNITED STATES DISTRICT JUDGE